## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THI MEDICAL, S.A.C., a Peruvian
company,

       Plaintiff,

v.

PPE SOLUTIONS GROUP, LLC
a Wyoming limited liability company,
KYLE BARNETTE, an individual,
JPJD2020, LLC, a New York limited
liability company, YOHAN J. PARK,
an individual, CLAUDIO TORRES, an
individual, and TUV RHEINLAND
GROUP, a German corporation,

       Defendants.

_____/

CASE NO.: _____

**COMPLAINT**

[DEMAND FOR JURY TRIAL]

      Plaintiff, THI Medical, S.A.C. ("THI"), by and through its undersigned counsel, sues PPE

Solutions Group, LLC ("PPE Solutions"), Kyle Barnette ("Barnette"), JPJD2020, LLC

("JPJD2020"), Yohan J. Park ("Park"), Claudio Torres ("Torres"), and TUV Rheinland Group

("TUV") (collectively, "Defendants") and states as follows:

### NATURE OF THE ACTION

      1.    The COVID-19 pandemic caused worldwide shortages in life-saving personal

protective equipment ("PPE").  In response, manufacturers ramped up production, and medical

suppliers sought to help countries meet the exploding demand.  As is often the case, Latin

American countries, with traditionally smaller healthcare budgets and buying power, increasingly

relied on independent businesses to find and source PPE.  THI, a Peruvian medical equipment

wholesaler, whose owner is himself a well-known physician in the country, entered the PPE

product space as a purchaser and scrambled to find a reliable source of PPE that it could quickly and efficiently supply to hospitals, government agencies, and others in-country.

2.      Unfortunately, where there is great need, fraudsters appear to game the system for their own personal benefit.  Defendants are some of those fraudsters and worked together to defraud THI in two separate transactions, selling THI a total of 763,400 counterfeit 3M 1860 N95 respirators (the "Product") for nearly $3,000,000.00.  PPE Solutions, with the assistance of its co-conspirators Torres, Barnette, JPJD2020, Park, and TUV, represented to THI that it could provide authentic 3M 1860 N95 respirators.  Defendants knew that the Product was destined for hospitals and government agencies and would be used to protect hundreds of thousands of people, including medical professionals on the front lines who were treating highly contagious COVID -19 patients.

3.      Defendants represented that the Product was authentic when they knew they were selling counterfeit 3M respirators.  Thereafter, PPE Solutions used a series of bogus documents to convince THI to send PPE Solutions $2,801,636.00 and Torres $126,244.00 on two transactions for counterfeit respirators.  Finally, as part of this fraudulent scheme to defraud THI, PPE Solutions and JPJD2020 worked together with TUV to prepare fraudulent inspection reports, which falsely confirmed the authenticity of the Product.

4.      Once the Product arrived in Peru in early January 2021, the gravity of THI's problem became apparent.  After the goods cleared customs, 3M filed a complaint with Peru's National Institute for the Defense of Competition and the Protection of Intellectual Property ("INDECOPI"),[1] claiming that the Product was counterfeit.  The Product was then seized and has been held by INDECOPI ever since.

---

[1]      INDECOPI is a Peruvian governmental agency that promotes competition and the protection of intellectual property rights.

2

5.     In order to defend itself from what it believed at the time was an error by 3M, THI reached out to PPE Solutions and Torres to request additional documentation demonstrating the authenticity of the Product.  PPE Solutions and Torres sent documents that THI would later learn were phony.  These documents included invoices, order confirmations, certifications, and even emails that had purportedly been sent by 3M confirming the authenticity of the Product.  In short, Defendants not only defrauded THI at the inception of their relationship, but they doubled down on that fraud in an attempt to avoid liability.  THI now faces civil penalties and fines in Peru from INDECOPI, is being sued by its clients in Peru, and is out millions of dollars paid to obtain what are unusable, unsellable, and counterfeit 3M respirators.

## **THE PARTIES**

6.     Plaintiff THI is a corporation organized and existing under the laws of Peru with its principal place of business located at Calle Domingo de la Presa 252, Santiago de Sucro 15023, Peru.  John Seminario Salazar ("Seminario") is the Chief Executive Officer of THI.

7.     Defendant PPE Solutions is a limited liability company organized and existing under the laws of the State of Wyoming, with its principal place of business at 395 Broadway, New York, New York 10013. PPE Solutions used this office address in its contracts, invoices, and wire instructions for its transactions with THI.

8.     Defendant Barnette is, upon information and belief, domiciled in New Hampshire and is the Chief Executive Officer of PPE Solutions.  Barnette is a co-conspirator in the fraud orchestrated by PPE Solutions.

9.     Defendant JPJD2020 is a limited liability company organized and existing under the laws of the State of New York with its principal place of business at 146 Sullivan Street, Unit

3

19, New York, New York 10012.  JPJD2020 is a co-conspirator in the fraud orchestrated by PPE Solutions.

10.     Defendant Park is, upon information and belief, domiciled in New Jersey.  Park is a member of JPJD2020 and is a co-conspirator in the fraud orchestrated by PPE Solutions.

11.     Defendant Torres is, upon information and belief, domiciled in California and was an independent broker who introduced THI to PPE Solutions.  Torres is a co-conspirator in the fraud orchestrated by PPE Solutions.

12.     Defendant TUV is a corporation organized and existing under the laws of Germany, with its principal place of business located at Am Grauen Stein Koln, 51105 Germany.  TUV provides technical testing of products for safety, efficiency, and quality.  TUV's inspection reports falsely represented that the Product was authentic. TUV is a co-conspirator in the fraud orchestrated by PPE Solutions.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action under 28 U.S.C § 1331, as the contracts in question are governed by the United Nations Convention on Contracts for the International Sale of Goods (the "CISG"), a treaty to which the United States is a signatory.

14.     This Court has supplemental jurisdiction over claims against Torres, JPJD2020, Park, and TUV under 28 U.S.C. § 1367(a), as those claims arose out of the same case or controversy as the claims over which the Court has original jurisdiction.

15.     This Court has general personal jurisdiction over PPE Solutions pursuant to Section 301 of the New York Civil Practice Law and Rules, since PPE Solutions' principal place of business is located at 395 Broadway, New York, New York 10013.

16.     This Court has specific personal jurisdiction over PPE Solutions under Section 302(a)(1) of the New York Civil Practice Law and Rules, as the company transacts business within

the state.  This Court also has specific jurisdiction over PPE Solutions under Section 302(a)(2) of the New York Civil Practice Law and Rules because PPE Solutions committed a tortious act or acts within the State of New York, as further alleged below.  PPE Solutions' contacts with the State of New York are sufficient such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

17.    This Court has specific personal jurisdiction over Barnette pursuant to Section 302(a)(1) of the New York Civil Practice Law and Rules as he transacts business within the state. This Court also has specific personal jurisdiction over Barnette pursuant to Section 302(a)(2) of the New York Civil Practice Law and Rules because Barnette committed a tortious act or acts within the State of New York, as further alleged below.  Barnette's contacts with the State of New York are sufficient such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

18.    This Court has general personal jurisdiction over JPJD2020 pursuant to Section 301 of the New York Civil Practice Law and Rules, since JPJD2020 is organized and existing under the laws of the State of New York and has its principal place of business located at 146 Sullivan Street, #19 New York, New York 10012.

19.    This Court has specific personal jurisdiction over JPJD2020 pursuant to Section 302(a)(1) of the New York Civil Practice Law and Rules as JPJD2020 transacts business within the State of New York.  This Court also has specific personal jurisdiction over JPJD2020 pursuant to Section 302(a)(2) of the New York Civil Practice Law and Rules, because JPJD2020 committed a tortious act or acts within the State of New York, as further alleged below.  JPJD2020's contacts with the State of New York are sufficient such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

5

20.     This Court has specific personal jurisdiction over Park pursuant to Section 302(a)(2) of the New York Civil Practice Law and Rules, because Park committed a tortious act or acts within the State of New York, as further alleged below.  Park's contacts with the State of New York are sufficient such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

21.     This Court has specific personal jurisdiction over Torres pursuant to Section 302(a)(2), as Torres committed a tortious act or acts within the State of New York, as further alleged below.  Torres' contacts with the State of New York are sufficient such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

22.     This Court has specific personal jurisdiction over TUV pursuant to Section 302(a)(1) of the New York Civil Practice Law and Rules, since TUV transacts business within the State of New York through its wholly owned subsidiary TUV Rheinland of North America ("TUV America"), which at all times relevant to this lawsuit acted as an agent of TUV.  As well, this Court has specific personal jurisdiction over TUV under Section 302(a)(2) of the New York Civil Practice Law and Rules, because TUV committed a tortious act or acts within the State of New York, as further alleged below.  TUV's contacts with the State of New York are sufficient such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

23.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### *Torres Introduces THI to PPE Solutions*

24.     THI was introduced to Torres through a mutual connection.  Upon learning that THI was in search of 3M respirators for its clients in Peru, Torres advised he could locate the approximately 1.3 million respirators THI was seeking in exchange for a fee.

25.     Acting as THI's agent, Torres assisted THI in locating a distributor that could, according to Torres, fulfill THI's PPE needs.  Torres ultimately put THI in contact with two distributors, one of them being PPE Solutions, a Wyoming company engaged in the business of buying and selling PPE— specifically 3M 1860 N95 respirators.  Torres eventually sent THI what THI now knows to be a fraudulent and misleading invoice for consulting services in connection with his introduction of THI to PPE Solutions for the sale of "3M masks 1860."  *See* Torres Invoice, attached as Exhibit "A."

26.     Torres represented that Barnette, the head of PPE Solutions, and the company itself, could be trusted and were reputable.  Torres also advised THI that PPE Solutions could provide authentic 3M respirators to THI quickly.

27.     Torres intended to induce THI to rely on his misrepresentations by contracting to have PPE Solutions sell THI the Product and pay him a fee for finding authentic 3M respirators to purchase.

28.     Reasonably relying on Torres' representations, THI began negotiating with PPE Solutions for the purchase and sale of PPE, specifically 3M 1860 N95 respirators.  PPE Solutions represented to THI that it had authentic 3M respirators to sell and could ship them to THI in Peru.

### *THI and PPE Solutions Execute the First Contract*

29.     To convince THI of its ability to deliver authentic 3M respirators, Barnette sent THI an inspection report prepared by TUV—Inspection Report No. ITD2020N200431 ("Inspection Report 431").  *See* Inspection Report 431, attached as Exhibit "B." Inspection Report 431, dated November 25, 2020, stated that the masks inspected were 3M 1860 N95 respirators. *See id*. at 1-2, 7-9.  The photos included in Inspection Report 431 also show the respirators in 3M packaging and bearing the lot number B20245.  *Id.* at 3-9.

30.     Thereafter, Barnette sent THI a Buyer Contract for Product Sales and Purchase (the "First Contract").  *See* First Contract, attached as Exhibit "C."

31.     The First Contract, which was provided and drafted by PPE Solutions, stated that New York law governs "all matters arising out of or relating to" the First Contract.  *See id*. Moreover, the First Contract did not exclude the application of the CISG, a treaty to which the United States and Peru are signatories.  *See id*.

32.     The First Contract included numerous representations that the 3M respirators were authentic and complied with 3M's quality standards. These representations included the following:

a.      "This Contract is for 3M N95 1860 Face Masks;"

b.      The Seller shall provide a third-party inspection agency, TUV, that will confirm "that the Products [3M Masks] conform to the specifications set forth by 3M in connection with the Product [3M Masks];" and

c.      "All original documents including the original invoices, letter of conformity, the original air waybill and all additional documents" would be sent to THI.

*See id.*

33.     Nothing in Inspection Report 431 or the First Contract would have given a purchaser pause as to the authenticity of the Product.   To the contrary, all representations confirmed that the respirators were being directly sourced from 3M.   THI relied on the representations made by PPE Solutions and TUV, including those in the First Contract and in Inspection Report 431, when executing the First Contract—reasonably anticipating that it would be receiving authentic 3M respirators.

34.     Accordingly, on December 1, 2020, Seminario, on behalf of THI in Peru, and Barnette, on behalf of PPE Solutions in New York, executed the First Contract.  *See id*.   THI promised to pay $825,984.00 to PPE Solutions, and PPE Solutions promised to deliver 229,440 3M 1860 N95 respirators ("First Order").  *See id*.

35.     On or around December 12, 2020, PPE Solutions sent THI an invoice confirming THI's purchase.   The invoice was consistent with the terms set forth in the First Contract.  *See* December 12, 2020, Invoice, attached as Exhibit "D."  The invoice further noted in the description section that the order was for "3M N95 1860 masks." *See id*.

36.     Attached to the invoice was PPE Solutions' wire instructions for THI to submit payment to PPE Solutions' New York bank account.  On or around December 14, 2020, THI wired $825,984.00 to PPE Solutions, thereby completing THI's obligations under the First Contract.

37.     As part of the First Contract, the parties agreed to Ex Works shipping terms.

38.     The First Order was shipped from Hong Kong, where they were purportedly in the possession of Zhen Qi Trade Co., Ltd. ("Zhen Qi"), to PPE Solutions' warehouse in New Jersey.

39.     THI then had to arrange pickup of the First Order at Seller's warehouse in New Jersey.

40.     Despite the original Ex-Works New Jersey shipping term reflected in the December 12, 2020 Invoice, PPE Solutions shipped the First Order from New York to Miami, Florida, where THI then took possession and arranged for shipping to Lima, Peru.

41.     THI hired and paid Sovereign Logistics del Peru, S.A.C. ("Sovereign"), a Peruvian transport company, to ship the First Order from Miami, Florida to Lima, Peru.  Sovereign transported the First Order to Lima, Peru on or around December 26, 2020.

42.     The First Order arrived in Peru sometime in early January 2021.

***THI and PPE Solutions Execute a Second Contract, and JPJD2020 Assists in the Transaction***

43.     THI was in need of additional respirators and inquired whether PPE Solutions could provide them. PPE Solutions advised THI that it could provide additional 3M respirators.

44.     Accordingly, on or around December 17, 2020, PPE Solutions sent THI another invoice for an additional 533,960 3M respirators with a sales price of $1,975,652.00 ("Second Order"). The second invoice contained a description of the respirators being purchased as "3M N95 1860 masks." *See* December 17, 2020 Invoice attached as Exhibit "E."  This second invoice was sent before THI received the First Order from PPE Solutions.

45.     That same day, THI also received three (3) invoices with corresponding packing lists from JPJD2020 totaling 533,960 3M respirators.  *See* JPJD2020 Invoices and Packing Lists, attached as Composite Exhibit "F."  All three of the invoices described the items invoiced as "3M N95 1860 masks."

46.     Unbeknownst to THI, PPE Solutions had engaged the help of JPJD2020[2] and its member, Park, to fulfill PPE Solutions' obligations for the Second Order.

---

[2]     Barnette and Park, once classmates at Rutgers University, co-founded PPE Solutions.  A few years later, Park ventured out and started JPJD2020, a company in which Park continued to work very closely with PPE Solutions and Barnette. Here, Barnette and Park worked closely together to defraud THI.

47.     The following day, THI received another Buyer Contract for Product Sales and Purchase (the "Second Contract") from PPE Solutions.  *See* Second Contract, attached as Exhibit "G."  The Second Contract was for the purchase of 500,000[3] 3M 1860 N95 respirators for a purchase price of $1,850,800. *See id*.  The Second Contract provided that New York law applied to "all matters arising out of or relating to this [Second] Contract," and did not contain any provision excluding the application of the CISG.  *See id*.

48.     Importantly, it included virtually identical representations as those contained in the First Contract, specifically that the Second Order was authentic and complied with 3M's quality standards, and further specified that:

a.     "This Contract is for 3M N95 1860 Face Masks;"

b.     The Seller (PPE Solutions) shall provide a third-party inspection agency, TUV, which would confirm "that the Products [3M Masks] in a shipment conform to the specifications set forth by 3M in connection with the Product [3M Masks];" and

c.     "All original documents including the original invoices, letter of conformity, the original air waybill and all additional documents" would be sent to THI.

*See id*.

49.     Having reviewed multiple invoices, all of which confirmed that THI was to receive authentic 3M respirators, together with the Second Contract that again provided that the Second Order was for authentic 3M products, Seminario executed the Second Contract on behalf of THI,

---

[3]     PPE Solutions later agreed to ship an additional 33,960 respirators, making the total amount 533,960 3M respirators for $1,975,652.00, as stated in the December 17 invoice.

and Barnette executed the Second Contract on behalf of PPE Solutions on December 18, 2020. *See id.*

50.     The Second Contract conspicuously left out any express mention of JPJD2020, despite JPJD2020 having sent THI three (3) invoices the day before.

51.     Nonetheless, JPJD continued to be involved in various aspects of the Second Contract. For instance, Park, on behalf of JPJD2020, ordered TUV to conduct Inspection Report No. ITD2020N200472 ("Inspection Report 472"), pursuant to PPE Solutions' obligations in the Second Contract.  *See* Inspection Report 472, attached as Exhibit "H."  Inspection Report 472, finalized on December 22, 2020, indicated that the masks inspected were 3M 1860 N95 respirators. The photos included in Inspection Report 472 also showed 3M packaging bearing the lot number B20281.

52.     Inspection Report 472 was provided to THI after it executed the Second Contract, but before the Second Order shipped from Hong Kong to Lima, Peru.

53.     Nothing in Inspection Report 472, the invoices, or the Second Contract would have given a purchaser pause as to whether the Second Order was authentic.  To the contrary, all representations confirmed that the Second Order was being directly sourced from 3M and was authentic.

54.     THI relied on the representations made by PPE Solutions and JPJD2020 when executing the Second Contract just a few days after the First Contract, and reasonably expected that it would be receiving authentic 3M respirators.

55.     THI wired $1,850,000 to PPE Solutions on December 21, 2020, and on December 23, 2020, THI wired $125,652.00, thereby completing THI's obligations under the Second Contract.

56.     As part of the Second Contract, the parties agreed to CIF shipping terms.  *See* Ex. "E;" *see also* Ex. "G."  This required PPE Solutions to pay the costs of shipping the Second Order to THI's facilities in Lima, Peru.

57.     JPJD2020 performed and executed on PPE Solutions' obligations under the Second Contact, and hired Shine International Transportation, Ltd. ("Shine") to ship the Second Order from Hong Kong to Lima, Peru.  JPJD2020 shipped the Second Order to THI in several different shipments during the period of December 25-28, 2020.

### An Unexpected Turn in Peru

58.     The Product[4] arrived in Peru at the beginning of January 2021. The Peruvian Customs Authority cleared the Product.  It also notified 3M Peruvian representatives that containers had arrived with items bearing the 3M trademark.

59.     Representatives from 3M inspected the Product and concluded that it was counterfeit.  As a result, 3M filed a complaint with INDECOPI, requesting that it seize the Product and require THI, as the importer of the purportedly counterfeit Product, to prove their authenticity before releasing them.

60.     On or around January 5, 2021, INDECOPI accepted 3M's petition, seized the Product, and ordered further inspections.  Thereafter, and to this day, THI has been forced to partake in administrative proceedings before INDECOPI.

61.     The seizure of the nearly one million respirators it paid for has derailed THI's business and ability to provide 3M respirators to its customers, to whom it had already sold the Product.  Consequently, THI now faces looming lawsuits from its clients as a result of Defendants' actions.

---

[4]     The Product (763,400 respirators) refers to the First Order (229,440 respirators) and Second Order (533,960 respirators), collectively.

62.     Further, THI has incurred substantial additional costs such as for customs clearance, storage, transportation, taxes, commissions, and attorneys' fees as a result of the proceedings in Peru and Defendants' wrongful acts.

### Torres, PPE Solutions, and JPJD2020 Continue to Defraud THI in the Aftermath

63.     After THI was unexpectedly forced to defend itself in administrative proceedings, Seminario, on behalf of THI, contacted Barnette (from PPE Solutions) and Torres requesting that they provide THI with any and all additional documentation reflecting the authenticity of the Product at issue.

64.     In response, Torres sent THI a fraudulent letter purporting to be from PPE Solutions to INDECOPI, confirming that the Product was authentic when, in fact, it was counterfeit.

65.     Then, on or around February 4, 2021, Barnette sent THI two separate emails with documents purporting to authenticate the Product.  All of the documents appeared to have been created by 3M, as 3M's trademark was present on each one.  The first email from Barnette contained documents related to the First Contract, including:

     a.     A 3M bill of lading dated November 13, 2020, indicating that 1,500,00 3M respirators were leaving from Toronto, Canada destined for Zhen Qi in Hong Kong, China;

     b.     A 3M order confirmation from Zhen Qi, reflecting an order date of November 2, 2020, for an order for 1,500,000 3M respirators;

     c.     A 3M invoice with an order date of November 2, 2020, indicating that 1,500,000 3M respirators from lot number B20245 were shipping from Toronto, Canada to Zhen Qi in Hong Kong, China;

14

d.  A 3M ship notice with a shipment date of November 13, 2020, indicating that 1,500,000 3M respirators were shipping from Toronto, Canada to Zhen Qi in Hong Kong;

e.  A 3M Certificate of Lot Conformance reflecting that the First Order was produced in accordance with the standard manufacturing processes for 3M respirators;

f.  A copy of a 3M letter to Mr. Manlio Bassino ("Bassino") 3M's agent in Peru ("3M Letter to Bassino").[5]  The 3M Letter to Bassino indicated that the First Order from lot B20245 was manufactured in 3M's Aberdeen Plant in South Dakota and was authentic 3M respirators; and

g.  Inspection Report 431, which reflected that the First Order was authentic, came from lot B20245, and conformed to 3M's quality standards.

*See* February 4, 2021 Email 1 and Documents, attached as Composite Exhibit "I."

66.  That same day, Barnette sent THI a second email with similar documentation supporting the alleged authenticity of the Second Order from the Second Contract.  This second email contained:

a.  A 3M bill of lading dated October 16, 2020 indicating that 1,000,00 3M respirators were shipping from Roanoke, Texas to Zhen Qi in Hong Kong, China;

b.  A 3M order confirmation from Zhen Qi, reflecting an order date of October 5, 2020, for 1,000,000 3M respirators;

---

[5]  This 3M Letter was later declared by 3M's Chief Trademark Counsel to be a fabricated 3M document.

     c.     A 3M invoice with an order date of October 5, 2020, indicating that 1,000,000 3M respirators from lot number B20281 were shipping from Roanoke, Texas to Zhen Qi in Hong Kong, China;

     d.     A 3M ship notice with a shipment date of October 16, 2020, indicating that 1,000,000 3M respirators were shipping from Roanoke, Texas to Zhen Qi in Hong Kong;

     e.     A 3M Certificate of Lot Conformance stating that the Second Order from lot B20281 was "produced in accordance with the standard manufacturing processes for [3M masks];" and

     f.     Inspection Report 472, which claimed that the Second Order was authentic, came from lot B20281, and conformed to 3M's quality standards.

*See* February 4, 2021 Email 2 and Documents, attached as Composite Exhibit "J."

67.     Approximately one week later, Barnette sent THI another email in which he forwarded a second letter—purportedly from 3M—confirming the authenticity of the Second Order. The forwarded email shows that the letter was originally sent to yjp216@nyu.edu, Park's email address. Rather than being addressed to Park, however, the second 3M letter was addressed to Shi Xiu Ren[6] and purported to confirm that the Second Order bearing lot number B20281 was authentic and manufactured in 3M's Aberdeen Plant in South Dakota ("3M Letter to Shi Xiu"). *See* Email and 3M Letter to Shi Xiu, attached as Exhibit "K."

68.     The 3M Letter to Shi Xiu was almost identical to the 3M Letter to Bassino. The only differences were the addressee and the lot number.

***The INDECOPI Proceedings***

---

[6]     Upon information and belief, Shi Xiu Ren is the president/director of Zhen Qi – the Hong Kong supplier from whom PPE Solutions and JPJD2020 assert they purchased the Product.

69.     The INDECOPI proceedings have also laid bare the extent of Defendants' fraudulent scheme.

70.     On or around February 26, 2021, 3M's Chief Trademark Counsel, Colette Durst ("Durst"), filed an affidavit in those proceedings, explaining that the Product was indeed counterfeit.  Durst made several alarming declarations:

      a.    PPE Solutions is not an authorized distributor of 3M and has no commercial relationship with 3M.

      b.    3M only manufactures 1860 respirators in the United States and Singapore. All shipments of 1860 respirators from China "shall be deemed as counterfeit, as the one made in this case."

      c.    3M published Customer Alerts identifying lots B20245 and B20281 (among others) as counterfeit.

      d.    3M has no relationship with TUV and TUV does not have the knowledge or background to authenticate 3M's respirators.

71.     3M has since also confirmed that the 3M Letter to Bassino purporting to classify lot B20245 as authentic (Exhibit "I") is fraudulent and did not originate from 3M's servers. Moreover, 3M has advised that the noreply@mmm.com email that purportedly was used to send the 3M Letter to Bassino and the 3M Letter to Shi Xiu is not a legitimate 3M email account.

72.     Within the INDECOPI proceedings, 3M has requested sanctions against THI for attempting to import counterfeit 3M respirators, further damaging THI's reputation in Peru.

73.     THI has been obligated to retain the undersigned and to pay them a reasonable fee to bring this suit.

74.     All conditions precedent to bringing this lawsuit have been performed, excused, and/or waived.

## COUNT I
**Breach of Contract for International Sale of Goods**
**Under the CISG**
**(Against PPE Solutions – First Contract)**

75.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

76.     On or around December 1, 2020, THI and PPE Solutions executed the First Contract.  Under the First Contract, PPE Solutions was required to deliver 229,440 3M 1860 N95 respirators to THI.  *See* Ex. "C."  THI was responsible for arranging shipping from PPE Solutions' warehouse in New Jersey to Lima, Peru.

77.     Both the United States and Peru are signatories to the CISG.  The First Contract does not expressly exclude the application of the CISG.  Therefore, the CISG governs the formation of the First Contract between THI and PPE Solutions and the rights and obligations of THI and PPE Solutions arising under the First Contract.

78.     In the beginning of January, the First Order arrived in Peru and 3M representatives examined it.  The 3M representatives ultimately concluded that the First Order was counterfeit and filed a complaint against THI, which was subsequently admitted by INDECOPI on January 5, 2021.

79.     PPE Solutions fundamentally breached the First Contract by failing to deliver 3M respirators that were of the quality and description required by the First Contract.

80.     The breach substantially deprived THI of what it reasonably expected under the First Contract.

81.     Although THI has taken measures to mitigate the impact of PPE Solutions' fundamental breach, THI has nevertheless suffered damages for which it is entitled to

compensation under the CISG.  To wit, Article 74 of the CISG provides for "[d]amages for breach of contract by one party" calculated as the "sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach."  CISG, Art. 74.

82.     THI has suffered recoverable damages.

83.     THI is further entitled to recover pre-judgment interest on the $825,984.00 it paid to PPE Solutions.

WHEREFORE, THI demands judgment against Defendant PPE Solutions for damages, including any and all foreseeable damages, costs, shipping costs, lost profits, incidental and consequential damages, as well as prejudgment interest and interest at a rate prescribed under Section 5001(a) of the New York Civil Practice Law and Rules, and for such further relief as the Court deems just and proper.

## COUNT II
**Breach of Contract for International Sale of Goods
Under the CISG
(Against PPE Solutions – Second Contract)**

84.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

85.     On or around December 18, 2020, THI and PPE Solutions executed the Second Contract.  Under the Second Contract, PPE Solutions was required to deliver 500,000 3M 1860 N95 respirators to THI.  *See* Ex. "G."  PPE Solutions was responsible for arranging shipping from its warehouse to Lima, Peru.

86.     Both the United States and Peru are signatories to the CISG.  The Second Contract did not expressly exclude the application of the CISG.  Therefore, the CISG governs the formation of the Second Contract between THI and PPE Solutions and the rights and obligations of THI and PPE Solutions arising under the Second Contract.

87.     In the beginning of January, the Second Order arrived in Peru and 3M representatives examined it.  The 3M representatives ultimately concluded that the Second Order was counterfeit and filed a complaint against THI, which was subsequently admitted by INDECOPI on January 5, 2021.

88.     PPE Solutions fundamentally breached the Second Contract by failing to deliver 3M respirators that were of the quality and description required by the Second Contract.

89.     The breach substantially deprived THI of what it reasonably expected under the Second Contract.

90.     Although THI has taken measures to mitigate the impact of PPE Solutions' fundamental breach, THI has nevertheless suffered damages for which it is entitled to compensation under the CISG.  To wit, Article 74 of the CISG provides for "[d]amages for breach of contract by one party" calculated as the "sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach."  CISG, Art. 74.

91.     THI has suffered recoverable damages.

92.     THI is further entitled to recover pre-judgment interest on the $1,975,652.00 it paid to PPE Solutions.

WHEREFORE, THI demands judgment against Defendant PPE Solutions for damages, including any and all foreseeable damages, costs, shipping costs, lost profits, incidental and consequential damages, as well as prejudgment interest and interest at a rate prescribed under Section 5001(a) of the New York Civil Practice Law and Rules, and for such further relief as the Court deems just and proper.

**COUNT III**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against PPE Solutions – First Contract)**

93.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

94.     THI and PPE Solutions are parties to the First Contract. Under the First Contract, THI had a reasonable commercial expectation of receiving authentic 3M respirators, the express delivery of which was required under the First Contract.

95.     In executing its obligations, PPE Solutions consciously and deliberately refused to discharge its contractual obligations under the First Contract, and it knew that the First Order it provided to THI was not authentic and did not conform to 3M's quality standards.

96.     PPE Solutions' failure to deliver authentic 3M respirators to THI unfairly frustrated the First Contract's purpose and disappointed THI's expectations, which was to provide authentic 3M respirators to THI so that THI could then fulfill its obligations to its clients.

97.     PPE Solutions' failure to deliver authentic 3M respirators is a material breach of the First Contract, which has deprived THI of the First Contract's benefits.

98.     As a result of PPE Solutions' breach, THI has suffered damages and is entitled to same.

WHEREFORE, THI demands judgment against Defendant PPE Solutions for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and for such further relief as the Court deems just and proper.

### COUNT IV
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against PPE Solutions – Second Contract)

99.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

100.    THI and PPE Solutions are parties to the Second Contract. Under the Second Contract, THI had a reasonable commercial expectation of receiving authentic 3M respirators, the express delivery of which was required under the Second Contract.

101.    In executing its obligations, PPE Solutions consciously and deliberately refused to discharge its contractual obligations under the Second Contract, and it knew that the Second Order it provided to THI was not authentic and did not conform to 3M's quality standards.

102.    PPE Solutions' failure to deliver authentic 3M respirators to THI unfairly frustrated the Second Contract's purpose and disappointed THI's expectations, which was to provide authentic 3M respirators to THI so that THI could then fulfill its obligations to its clients.

103.    PPE Solutions' failure to deliver authentic 3M respirators is a material breach of the Second Contract, which has deprived THI of the Second Contract's benefits.

104.    As a result of PPE Solutions' breach, THI has suffered damages and is entitled to same.

WHEREFORE, THI demands judgment against Defendant PPE Solutions for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and for such further relief as the Court deems just and proper.

**COUNT V**
**Fraudulent Inducement**
**(Against Torres)**

105.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

106.    Torres made false representations to THI regarding his ability to find a reputable and reliable distributor that could fulfill THI's PPE needs.

107.    Torres also falsely represented that Barnette and PPE Solutions were trustworthy and reputable, knowing that they were not.

108.    Torres further falsely represented that PPE Solutions had the capability to provide authentic 3M 1860 N95 respirators to THI.

109.    At all times relevant hereto, Torres knew that these representations were untrue, and that PPE Solutions could not provide authentic 3M respirators.

110.    Torres made these false representations with the intention of inducing THI to rely on his representations that PPE Solutions could supply THI with authentic 3M respirators that met 3M's quality standards.

111.    THI justifiably relied on Torres' misrepresentations and executed the First Contract and Second Contract with PPE Solutions, rendering full payment to PPE Solutions under both contracts.  Additionally, based on Torres' representations, THI agreed to pay and did pay, Torres a fee for introducing THI to PPE Solutions.  *See* Ex. "A."

112.    PPE Solutions failed to provide authentic 3M respirators to THI, pursuant to the terms of the First Contract and Second Contract.

113.    As a result of Torres' misrepresentations, THI has been damaged.

WHEREFORE, THI demands judgment against Defendant Torres for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and for such further relief as the Court deems just and proper.

### <u>COUNT VI</u>
**Fraudulent Inducement**
**(Against Barnette and PPE Solutions – First Contract)**

114.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

115.    Barnette and PPE Solutions provided Inspection Report 431 to THI in an effort to induce THI to execute the First Contract with PPE Solutions.  Inspection Report 431 contained false, deceptive, and misleading statements and representations regarding the First Order, including:

a.       Representations that the First Order was for 3M 1860 N95 respirators;

      b.      Photos showing the First Order in 3M packaging; and

      c.      Photos bearing lot number B20245, the same lot number that the First Order purportedly came from.

*See* Ex. "B."

116.    Barnette and PPE Solutions also made numerous false representations of material fact in the First Contract with THI regarding the authenticity of the First Order, including:

      a.      Representing that the First Contract was for "3M N95 1860 Face Masks;"

      b.      Representing that TUV would confirm "that the [First Order] conform to the specifications set forth by 3M in connection with the [First Order];" and

      c.      Representing that "[a]ll original documents including the original invoices, letter of conformity, the original air waybill and all additional documents" would be sent to THI.

*See* Ex. "C."

117.    At all times relevant hereto, Barnette and PPE Solutions knew that these representations were untrue, and that PPE Solutions could not provide authentic 3M respirators.

118.    Barnette and PPE Solutions made these false representations with the intention of inducing THI to rely on the representations that the First Order conformed to 3M's quality standards.

119.    THI justifiably relied on Barnette's and PPE Solutions' misrepresentations and rendered full payment for the First Order.

120.    PPE Solutions failed to provide authentic 3M respirators to THI, pursuant to the terms of the First Contract.

121.     As a result of Barnette's and PPE Solutions' misrepresentations, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Barnette and PPE Solutions for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

**COUNT VII**
**Fraudulent Inducement**
**(Against Barnette and PPE Solutions – Second Contract)**

122.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

123.     Barnette and PPE Solutions falsely represented to THI that PPE Solutions would deliver an additional 533,960 "3M N95 1860 Masks" to THI in PPE Solutions' December 17, 2020 Invoice. *See* Ex. "E."

124.     Barnette and PPE Solutions also made numerous false representations of material fact in the Second Contact with THI regarding the authenticity of the Second Order including:

a.     Representing that the Second Contract was for "3M N95 1860 Face Masks;"

b.     Representing that TUV would confirm "that the [Second Order] in a shipment conform to the specifications set forth by 3M in connection with the [Second Order];" and

c.     Representing that "[a]ll original documents including the original invoices, letter of conformity, the original air waybill and all additional documents" would be sent to THI.

*See* Ex. "G."

125.     At all times relevant hereto, Barnette and PPE Solutions knew that these representations were untrue, and that PPE Solutions could not provide authentic 3M respirators.

126.    Barnette and PPE Solutions made these false representations with the intention of inducing THI to rely on the representations that the Second Order conformed to 3M's quality standards.

127.    THI justifiably relied on Barnette's and PPE Solutions' misrepresentations and rendered full payment for the Second Order.

128.    PPE Solutions failed to provide authentic 3M respirators to THI, pursuant to the terms of the Second Contract.

129.    As a result of Barnette's and PPE Solutions' misrepresentations, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Barnette and PPE Solutions for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

## COUNT VIII
**Fraudulent Inducement**
**(Against Park and JPJD2020 – Second Contract)**

130.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

131.    Park and JPJD2020 falsely represented that JPJD2020 was providing THI an additional 533,960 "3M N95 1860 Masks" in JPJD2020's December 17, 2020 Invoices.  *See* Ex. "F."

132.    At all times relevant hereto, Park and JPJD2020 knew that these representations were untrue, and that JPJD2020 could not provide authentic 3M respirators.

133.    Park and JPJD2020 made these false representations with the intention of inducing THI to rely on the representations that the Second Order conformed to 3M's quality standards.

134.     THI justifiably relied on Park's and JPJD2020's misrepresentations and rendered full payment for the Second Order.

135.     As a result of Park's and JPJD2020's misrepresentations, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Park and JPJD2020 for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

**COUNT IX**
**Fraudulent Inducement**
**(Against TUV – First Contract)**

136.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

137.     TUV made false representations of material fact to THI regarding the authenticity of the First Order through Inspection Report 431, including:

a.      Representing that the First Order consisted of 3M 1860 N95 respirators;

b.      Representing that the First Order was in 3M packaging;

c.      Representing that the First Order contained an authentic lot number of B20245; and

d.      Representing that the First Order conformed to 3M's quality standards.

*See* Ex. "B."

138.     At all times relevant hereto, TUV knew that these representations were untrue, and that the First Order was not authentic.

139.     TUV intended for purchasers contracting with PPE Solutions, including THI, to rely on TUV's representations in Inspection Report 431 that the 3M respirators conformed to 3M's quality standards so that those purchasers would buy fake 3M respirators from PPE Solutions believing they were authentic.

27

140.    THI justifiably relied on TUV's misrepresentations and rendered full payment for the First Order to PPE Solutions.

141.    As a result of TUV's misrepresentations, THI has been damaged.

WHEREFORE, THI demands judgment against Defendant TUV for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

### COUNT X
**Fraud**
**(Against Torres)**

142.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

143.    THI was in search of a distributor to provide 3M 1860 N95 respirators to fulfill its clients' needs in Peru.

144.    Torres was aware that THI was looking for PPE, specifically 3M respirators.

145.    Torres represented that PPE Solutions was capable of providing authentic 3M respirators to THI.

146.    Torres, through and with the assistance of PPE Solutions, misrepresented PPE Solutions' ability to provide THI with authentic 3M respirators and knew that such representations were false when made, as more particularly alleged above, including as follows:

    a.    Representing that Barnette and PPE Solutions were reputable and trustworthy;

    b.    Representing that PPE Solutions had the ability to provide authentic 3M respirators;

    c.    Providing an invoice to THI for consulting services for the sale of "3M masks 1860;" and

28

        d.      Providing THI a fraudulent letter purporting to be from PPE Solutions to INDECOPI, confirming that the Product was authentic.

*See* Ex. "A."

147.    Each of those representations were knowingly false when made.

148.    Torres made the foregoing misrepresentations and omissions knowing that they were material to THI, with the intent of inducing reliance on the part of THI.

149.    THI relied on the aforementioned false representations and paid PPE Solutions $2,801,636.00 for the Product and $126,244.00 to Torres for consulting services.  THI also expended significant funds to ship the Product, and promised to deliver the Product to its clients, incurring significant additional fees and exposure to potential liability in the process.

150.    As a direct and proximate result of the materially false representations made by Torres, through and with the full cooperation and assistance of PPE Solutions, THI has been damaged.

WHEREFORE, THI demands judgment against Defendant Torres for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and for such further relief as the Court deems just and proper.

## COUNT XI
### Fraud
### (Against Barnette and PPE Solutions)

151.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

152.    THI was in search of a distributor to provide 3M 1860 N95 respirators to fulfill its clients' needs in Peru.

153.    Barnette was aware that THI was looking for PPE, specifically 3M respirators.

154.    PPE Solutions held itself out as being able to provide authentic 3M respirators for THI through its Hong Kong supplier, Zhen Qi.

155.    Barnette, through and with the assistance of PPE Solutions, made various misrepresentations of material fact to THI in conjunction with negotiations over the First Contract, as follows:

a.    Providing Inspection Report 431 to THI in order to induce THI to execute the First Contract with PPE Solutions;

b.    Providing a December 12, 2020 invoice to THI stating that THI was purchasing 229,440 "3M N95 1860 Masks;"

c.    Representing that the First Contract was for "3M N95 1860 Face Masks;"

d.    Representing that TUV would confirm "that the [First Order] conform to the specifications set forth by 3M in connection with the [First Order];"

e.    Representing that "[a]ll original documents including the original invoices, letter of conformity, the original air waybill and all additional documents" would be sent to THI;

f.    Providing fraudulent 3M Documents to THI after THI had notified Barnette that its shipment of the First Order had been deemed counterfeit by 3M; and

g.    Providing the fake 3M Letter to Bassino purporting to state that lot B20245, the lot that the First Order supposedly came from, was authentic and conformed to 3M's quality standards.

*See* Exs. "B"- "D;" and "I."

156.    Barnette, through and with the assistance of PPE Solutions, also made various representation of material fact to THI in connection with the Second Contract, and Barnette and

PPE Solutions knew these representations were false when made, as more particularly alleged above, and which included:

    a.    Providing a December 17, 2020 invoice to THI stating that THI was purchasing an additional 533,960 "3M N95 1860 Masks;"

    b.    Representing that the Second Contract was for "3M N95 1860 Face Masks;"

    c.    Representing that TUV would confirm "that the [Second Order] in a shipment conform to the specifications set forth by 3M in connection with the [Second Order];"

    d.    Representing that "[a]ll original documents including the original invoices, letter of conformity, the original air waybill and all additional documents" would be sent to THI;

    e.    Providing Inspection Report 472 to THI after execution of the Second Contract to confirm that the Second Order was authentic, knowing that it was counterfeit;

    f.    Providing phony 3M Documents to THI after THI had notified Barnette that the Second Order had been deemed counterfeit by 3M; and

    g.    Providing the fake 3M Letter to Shi Xiu purporting to state that lot B20281, the lot that the Second Order supposedly came from, was authentic and conformed to 3M's quality standards.

*See* Exs. "E;" "G;" "H;" "J;" and "K."

157.    At all times relevant hereto, Barnette and PPE Solutions knew that these representations were false, and that PPE Solutions could not provide authentic 3M respirators.

158.    Barnette and PPE Solutions made the foregoing misrepresentations and omissions knowing that they were material to THI, with the intent of inducing reliance on the part of THI.

159.    THI justifiably relied on Barnette's and PPE Solutions' misrepresentations and rendered a total of $2,801,636.00 to PPE Solutions' bank account.  It also expended significant funds to ship the Product, and promised to deliver the Product to its clients, incurring significant additional fees and exposure to potential liability in the process.

160.    PPE Solutions failed to provide authentic 3M respirators to THI, pursuant to the terms of the First Contract and Second Contract.

161.    As a direct and proximate result of the materially false representations made by Barnette, through and with the full cooperation and assistance of PPE Solutions, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Barnette and PPE Solutions for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

## COUNT XII
**Fraud**
**(Against TUV)**

162.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

163.    TUV made misrepresentations of material fact to THI regarding the authenticity of the Product through Inspection Report 431 and Inspection Report 472, including as follows:

      a.      Representing that the Product was 3M 1860 N95 respirators;

      b.      Representing that the Product was in 3M packaging;

      c.      Representing that the Product contained authentic lot numbers of B20245 and B20281; and

d.    Representing that the Product conformed to 3M's quality standards.

*See* Exs. "B;" and "H."

164.    At all times relevant hereto, TUV knew that these representations were false, and that the Product was not authentic.

165.    TUV intended for purchasers contracting with PPE Solutions, including THI, to rely on its representations that the Product conformed to 3M's quality standards so that those purchasers would buy fake 3M respirators from PPE Solutions believing that they were authentic.

166.    THI justifiably relied on TUV's misrepresentations and rendered full payment for the First Order to PPE Solutions under the First Contract.

167.    THI justifiably relied on TUV's misrepresentations to confirm that the Second Order was authentic.

168.    As a result of TUV's misrepresentations, THI has been damaged.

WHEREFORE, THI demands judgment against Defendant TUV for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

<u>**COUNT XIII**</u>
**Fraud**
**(Against Park and JPJD2020)**

169.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

170.    At all times relevant to this lawsuit, JPJD2020 and Park were acting as agents of PPE Solutions when they performed under the Second Contract.

171.    Park was aware that THI was looking for PPE, specifically 3M respirators.

172.    JPJD2020 held itself out as being able to provide authentic 3M respirators for THI through its Hong Kong supplier, Zhen Qi.

33

173.     Park, through and with the assistance of JPJD2020, made various misrepresentations of material fact to THI in conjunction with negotiations over the Second Contract, as follows:

      a.     Representing that the Second Order was for "3M N95 1860" respirators;

      b.     Ordering fraudulent Inspection Report 472; and

      c.     Providing Inspection Report 472 to THI for THI to continue relying on the representations therein that the Second Order was authentic.

*See* Exs. "F;" and "H."

174.     At all times relevant hereto, Park and JPJD2020 knew that these representations were false, and that JPJD2020 could not provide authentic 3M respirators.

175.     Park and JPJD2020 made the foregoing misrepresentations and omissions knowing that they were material to THI, with the intent of inducing reliance on the part of THI.

176.     THI justifiably relied on Park's and JPJD2020's misrepresentations and carried on with the transaction.  THI also expended significant funds to ship the Second Order, and promised to deliver the Second Order to its clients, incurring significant additional fees and exposure to potential liability in the process.

177.     JPJD2020 failed to provide authentic 3M respirators to THI, pursuant to the terms of the Second Contract.

178.     As a direct and proximate result of the materially false representations made by Park, through and with the full cooperation and assistance of JPJD2020, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Park and JPJD2020 for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

## COUNT XIV
### Negligent Misrepresentation
### (Against Torres)

179.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

180.     A special relationship existed between THI and Torres, when Torres agreed to act as an agent of THI, and THI relied on Torres to locate a reputable distributor that could supply THI with authentic 3M respirators for THI's clients in Peru.

181.     As a result of this special relationship between THI and Torres, a duty was imposed on Torres to impart correct information to THI regarding the Product.

182.     Torres provided incorrect information to THI on the reputation and trustworthiness of Barnette and PPE Solutions.  That information was incorrect.

183.     Torres also provided incorrect information to THI that PPE Solutions could supply THI with authentic 3M respirators. That information was incorrect.

184.     THI reasonably relied on Torres' incorrect information and agreed to purchase 3M respirators from PPE Solutions for a total of $2,801,636.00 and pay Torres $126,244.00 for consulting services. THI also expended significant funds to ship the Product, and promised to deliver the Product to its clients, incurring significant additional fees and exposure to potential liability in the process.

185.     As a result of Torres' incorrect information, THI has been damaged.

WHEREFORE, THI demands judgment against Defendant Torres for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and for such further relief as the Court deems just and proper.

## COUNT XV
### Negligent Misrepresentation
### (Against Barnette and PPE Solutions)

186.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

187.    A special relationship existed between THI and PPE Solutions under the First Contract and Second Contract, imposing a duty on PPE Solutions to impart correct information to THI regarding the Product.

188.    Barnette and PPE Solutions provided incorrect information to THI regarding PPE Solutions' ability to supply authentic 3M respirators to THI.

189.    After executing both transactions, Barnette and PPE Solutions also provided incorrect information to THI concerning the authenticity of the Product.  *See* Exs. "B"-"E" and "G"-"K."

190.    THI reasonably relied on Barnette's and PPE Solutions' incorrect information provided when executing the First Contract, Second Contract, and thereafter once THI was forced to defend itself in the INDECOPI proceedings. THI also expended significant funds to ship the Product, and promised to deliver the Product to its clients, incurring significant additional fees and exposure to potential liability in the process.

191.    As a result of Barnette's and PPE Solutions' incorrect information, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Barnette and PPE Solutions for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

## COUNT XVI
### Negligent Misrepresentation
### (Against TUV)

192.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

193.    A special relationship existed between THI and TUV, as TUV was aware that purchasers, including THI, were relying on TUV's representations in Inspection Report 431 and Inspection Report 472 to confirm that the 3M respirators from PPE Solutions were authentic.  Due to this special relationship, a duty was imposed on TUV to impart correct information to THI.

194.    TUV provided incorrect information to THI by representing the Product in 3M packaging, when the Product was not manufactured by 3M.

195.    TUV also provided incorrect information to THI by falsely representing that the Product conformed to 3M's quality standards.  *See* Exs. "B;" and "H."

196.    THI reasonably relied on the incorrect information provided by TUV when executing the First Contract and thereafter once THI was forced to defend itself in the INDECOPI proceedings.

197.    THI also reasonably relied on the information provided by TUV to confirm that the Second Order was authentic prior to it being shipped to Lima, Peru.

198.    THI expended significant funds to ship the Product, and promised to deliver the Product to its clients, incurring significant additional fees and exposure to potential liability in the process.

199.    As a result of TUV's incorrect information, THI has been damaged.

WHEREFORE, THI demands judgment against Defendant TUV for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

**COUNT XVII**
**Negligent Misrepresentation**
**(Against Park and JPJD2020)**

200.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

37

201. At all times relevant to this lawsuit, Park and JPJD2020 were acting as agents of PPE Solutions when they performed under the Second Contract.

202. Therefore, a special relationship existed between THI on the one hand, and Park and JPJD2020 on the other, under the Second Contract, imposing a duty on Park and JPJD2020 to impart correct information to THI.

203. Park and JPJD2020 provided incorrect information to THI by representing that THI was purchasing authentic 3M respirators. *See* Ex. "F."

204. Park and JPJD2020 also provided incorrect information to THI by obtaining and providing Inspection Report 472 to THI. *See* Ex. "H."

205. THI reasonably relied on the incorrect information provided by Park and JPJD2020 to confirm that the Second Order was authentic prior to it being shipped to Lima, Peru and thereafter once THI was forced to defend itself in the INDECOPI proceedings. THI also promised to deliver the Second Order to its clients, incurring significant additional fees and exposure to potential liability in the process.

206. As a result of Park's and JPJD2020's incorrect information, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Park and JPJD2020 for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

## <u>COUNT XVIII</u>
### **Breach of New York's General Business Law § 349**
### **(Against PPE Solutions)**

207. THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

208. PPE Solutions engaged in a series of deceptive acts or practices against its customer, THI. PPE Solutions' deceptive acts or practices have a broader impact on consumers at

large because THI's clients—hospitals, government agencies, and others—have been unable to receive and utilize the Product for which they have already paid. Additionally, upon information and belief, PPE Solutions has been selling fake PPE to other consumers who have relied on and likewise been deceived by PPE Solutions' deceptive acts or practices designed to mislead customers into believing that they are purchasing authentic products, when in fact they are not.

209.    PPE Solutions contracted with THI on two separate occasions for the sale and delivery of 3M respirators to Peru, thereby engaging in "business, trade, or commerce" as defined in Section 349(a), New York General Business Law.

210.    THI, as a medical equipment wholesaler, is a "person" as contemplated by Section 349(h), New York General Business Law.

211.    PPE Solutions' deceptive acts or practices included, but were not limited to:

   a.    Misrepresenting that it was selling authentic 3M respirators;

   b.    Misrepresenting that the Product conformed to 3M's quality standards;

   c.    Misrepresenting that the Product was manufactured in 3M's Aberdeen, South Dakota plant in the United States;

   d.    Providing fraudulent documentation to support its position that the respirators it sold to THI were authentic;

   e.    Creating phony documentation to support its position that the respirators it sold to THI were authentic; and

   f.    Engaging the assistance of others to perpetrate its false narrative that PPE Solutions was providing THI authentic 3M respirators.

*See* Exs. "C"-"E;" "G;" and "I"-"K."

212.    THI paid a total of $2,801,636.00 to PPE Solutions under the First and Second Contracts.

213.    PPE Solutions' actions constitute deceptive acts or practices that are expressly prohibited by Section 349(a), New York General Business Law.

214.    As a direct and proximate cause of PPE Solutions' deceptive acts or practices, THI has suffered actual damages.  In addition to recovering its damages, THI is also entitled to its attorneys' fees and costs for having to bring this action for deceptive acts or practices under the applicable New York statute.

WHEREFORE, THI demands judgment against Defendant PPE Solutions for damages in an amount to be determined at trial, interest as allowed by law, reasonable attorneys' fees and costs pursuant to Section 349(h), New York General Business Law, and for such further relief as the Court deems just and proper.

## COUNT IXX
### Breach of New York's General Business Law § 349
### (Against JPJD2020)

215.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

216.    JPJD2020 engaged in a series of deceptive acts or practices against its customer, THI.  JPJD2020's deceptive acts or practices have a broader impact on consumers at large because THI's clients—hospitals, government agencies, and others—have been unable to receive and utilize the respirators for which they have already paid.  Additionally, upon information and belief, JPJD2020 has been similarly assisting PPE Solutions in the sale of fake PPE to other consumers who have relied on and likewise been deceived by JPJD2020's deceptive acts or practices designed to mislead customers into believing that they are purchasing authentic products, when in fact they are not.

217.    JPJD2020 acted as PPE Solutions' agent in the sale and delivery of the Second Order to Peru, thereby engaging in "business, trade, or commerce" as defined in Section 349(a), New York General Business Law.

218.    THI, as a medical equipment wholesaler, is a "person" as contemplated by Section 349(h), New York General Business Law.

219.    JPJD2020's deceptive acts or practices included, but were not limited to:

    a.    Misrepresenting that it was selling authentic 3M respirators;

    b.    Misrepresenting that the Second Order conformed to 3M's quality standards;

    c.    Ordering a false Inspection Report 472; and

    d.    Providing fraudulent Inspection Report 472 to THI, which falsely confirmed the Second Order was authentic.

*See* Exs. "F;" and "H."

220.    JPJD2020's actions constitute deceptive acts or practices that are expressly prohibited by Section 349(a), New York General Business Law.

221.    As a direct and proximate cause of JPJD2020's deceptive acts or practices, THI has suffered actual damages.  In addition to recovering its damages, THI is also entitled to its attorneys' fees and costs for having to bring this action for deceptive acts or practices under the applicable New York statute.

WHEREFORE, THI demands judgment against Defendant JPJD2020 for damages in an amount to be determined at trial, interest as allowed by law, reasonable attorneys' fees and costs pursuant to Section 349(h), New York General Business Law, and for such further relief as the Court deems just and proper.

**COUNT XX**
**Breach of Fiduciary Duty**
**(Against Torres)**

222.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

223.     At all times material hereto, a fiduciary relationship existed between THI and Torres, whereby Torres acted as an agent of THI, ostensibly to locate a reputable distributor that could supply THI with authentic 3M respirators.

224.     THI also placed trust and confidence in Torres to find a reliable distributor of 3M respirators in the United States.

225.     The fiduciary duty of Torres required him to act in the best interests of THI.

226.     Torres breached his fiduciary duty to THI when he introduced THI to PPE Solutions, a company that Torres knew could not provide THI with authentic 3M respirators.

227.     As a direct and proximate result of Torres' breach of his fiduciary duty to THI, THI has suffered damages.

WHEREFORE, THI demands judgment against Defendant Torres for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and for such further relief as the Court deems just and proper.

**COUNT XXI**
**Civil Conspiracy**
**(Against Defendants)**

228.     THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

229.     Defendants Torres, PPE Solutions, Barnette, JPJD2020, Park, and TUV entered into an express or implied agreement among themselves to unlawfully mislead, deceive, and defraud THI, as further described above, and to enrich themselves at THI's expense.

230. Torres, on his own behalf, performed one or more acts in furtherance of the conspiracy, as more particularly alleged above, including but not limited to:

     a. Introducing THI to Barnette and PPE Solutions, representing that they were reputable and trustworthy when he knew they were not;

     b. Advising THI that PPE Solutions could provide the requisite Product knowing that PPE Solutions could not provide authentic 3M respirators;

     c. Sending THI an invoice for consulting services related to the sale of the Product (*see* Ex. "A"); and

     d. Providing THI a phony letter that Torres affirmed had been sent by PPE Solutions to INDECOPI, in which PPE Solutions represents to INDECOPI that the Product sold to THI was authentic.

231. Barnette, on his own behalf and on behalf of PPE Solutions, performed one or more acts in furtherance of the conspiracy, as more particularly alleged above, including the following:

     a. Signing and sending the First Contract and Second Contract to THI, knowing that PPE Solutions did not have the capability to perform as promised;

     b. Sending an invoice for the First Contract and an invoice for the Second Contract, representing that the Product was authentic 3M respirators, when he knew they were not;

     c. Convincing THI to wire payments to PPE Solutions' New York bank account by falsely representing that the Product had been manufactured in the United States, were authentic 3M respirators, and that TUV had been able to confirm that the respirators were authentic; and

       d.       Sending deceptive, misleading, and fraudulent documents purporting to be from 3M that portrayed the Product as authentic, when they were counterfeit.

*See* Exs. "B"-"E;" and "G"-"K."

232.     Park, on his own behalf and on behalf of JPJD2020, performed one or more acts in furtherance of the conspiracy, as more particularly alleged above, including the following:

       a.       Representing that the Second Order was authentic "3M N95 1860 Masks" in JPJD2020's December 17, 2020 Invoice;

       b.       Ordering fraudulent Inspection Report 472; and

       c.       Providing Inspection Report 472 to THI in order to induce THI's reliance that the Second Order was authentic prior to shipping the respirators to Peru.

*See* Exs. "F;" and "H."

233.     TUV performed one or more acts in furtherance of the conspiracy, as more particularly alleged above, including the following:

       a.       Falsely representing in Inspection Report 431 and Inspection Report 472 that the respirators from lot numbers B20245 and B20281 were authentic 3M respirators; and

       b.       Falsely representing that the Product conformed to 3M's quality standards.

*See* Exs. "B" and "H."

234.     Defendants Torres, PPE Solutions, Barnette, JPJD2020, Park, and TUV intentionally participated in the furtherance of the plan to defraud THI, as evidenced by their subsequent overt actions.

235.    The combined actions of Torres, PPE Solutions, Barnette, JPJD2020, Park, and TUV were intended to induce THI to rely on the afore-described misrepresentations in executing the First Contract and Second Contract.

236.    As a direct and proximate result of the conspiracy to defraud, THI has been damaged.

WHEREFORE, THI demands judgment against Defendants Torres, PPE Solutions, Barnette, JPJD2020, Park, and TUV for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

**COUNT XXII**
**Unjust Enrichment**
**(Against Torres)**

237.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

238.    Torres was enriched at the expense of THI when THI paid $126,244.00 to Torres for consulting services in connection with introducing THI to PPE Solutions.

239.    Because the Product sold to THI has been seized by INDECOPI, the circumstances are such that it is against equity and good conscience to permit Torres to retain the $126,244.00 when THI did not receive the authentic 3M respirators that Torres knew THI had purchased.

WHEREFORE, THI demands judgment against Defendant Torres for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

**COUNT XXIII**
**(In the Alternative to Counts I-IV)**
**Conversion**
**(Against PPE Solutions)**

240.    THI re-alleges paragraphs 1 through 74 above as if fully integrated herein.

241.    THI had legal ownership and/or an immediate right of possession in the $2,801,636.00 that it wired to PPE Solutions' New York bank account with the express instructions that such monies were to be used to fulfill the First Contract and Second Contract.

242.    Rather than deliver the agreed to Product, PPE Solutions appropriated the funds for an unauthorized use.

243.    THI has demanded that PPE Solutions return the $2,801,636.00.

244.    To date, PPE Solutions has not responded and has also failed to refund any monies to THI.

245.    PPE Solutions' unauthorized dominion over THI's monies is to the exclusion of THI's rights and has deprived THI the use of those monies, including the ability to find another manufacturer and distributor of authentic 3M respirators.

246.    As a direct and proximate result of PPE Solutions' actions, THI has been damaged.

WHEREFORE, THI demands judgment against Defendant PPE Solutions for damages in an amount to be established at trial, as well as pre-judgment and post-judgment interest and taxable costs, and such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

THI demands a trial by jury for all matters so triable.

Dated:  May 4, 2021                Respectfully submitted,

DIAZ, REUS & TARG, LLP
100 Southeast Second Street
3400 Miami Tower
Miami, Florida 33131
Telephone: (305) 375-9220
Facsimile: (305) 375-8050

By: */s/ Marta Colomar Garcia*
Marta Colomar Garcia (NY Bar No. 5405618)
Email Address: mcolomar@diazreus.com

46

Roland Potts
*Pro Hac Vice Admission Pending*

*Counsel for Plaintiff THI Medical, S.A.C.*